UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION, COLUMBUS

| | |
|---|---|
| NASANDRA WRIGHT<br>c/o Tisdale Legal Group, PLLC<br>2930 Jasper St. #103<br>Philadelphia, PA 19134<br><br>     Plaintiff,<br><br>   v.<br><br>PICKAWAY COUNTY PUBLIC HEALTH;<br>PICKAWAY COUNTY GENERAL<br>HEALTH DISTRICT<br>c/o Carolyn Gutowski<br>485 Metro Place S<br>Suite 200<br>Dublin, Ohio 43017<br><br>     Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CASE NO. 2:21-cv-00684**<br><br>**JUDGE:**<br><br><br><br>**COMPLAINT FOR DAMAGES AND<br>INJUNCTIVE RELIEF**<br><br>**JURY DEMAND ENDORSED HEREIN** |

Plaintiff, Nasandra Wright, by and through undersigned counsel, as her Complaint against the Defendant, Pickaway County Public Health/Pickaway County General Health District, states and avers the following:

## NATURE OF THE CASE

1.  This is an employment discrimination case, brought pursuant to the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 (Section 1981); Title VII of the Civil Rights Act of  1964, 42 U.S.C. §§2000e, et seq., as amended (Title VII).

2.  Plaintiff alleges that Defendant discriminated against her on the basis of race, and national origin and she was retaliated against once she made an official complaint. Defendant's

discriminatory practices included ignoring complaints of racial discriminatory behavior, discrimination in conducting a performance evaluation, failure to compensate that was racially motivated, and retaliation for complaining about racial discriminatory behavior as alleged in this Complaint. Plaintiff seeks declaratory, injunctive, and equitable monetary relief from these practices; compensatory and punitive damages; equitable remedies of accounting, restitution and an award of costs, expenses, and attorney's fees.

## JURISDICTION AND VENUE

3.      This Court has proper jurisdiction of Plaintiff's Section 1981 claims pursuant to 20 U.S.C. §§ 1331 and 1343(a)(4), and Plaintiff's Title VII claims pursuant to those two provisions as well as 42 U.S.C. §2000e-5(f)(3).

4.      This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

5.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all other claims in this Complaint because they arise out of the same case or controversy.

6.      Venue is properly placed in the United States District Court for the District of Ohio, Eastern Division, because it is the district court for the district, division, and county within which the Defendant operates and conducts business.

## PARTIES

7.      Plaintiff Wright is an African American female and a resident of the City of Columbus in Franklin County, Ohio. Mrs. Wright was born in Jamaica. Mrs. Wright was employed by Defendant Pickaway County on March 4, 2019, pursuant a five year contract with an end date of March 4, 2024. Mrs. Wright was terminated by Defendant Pickaway County on or about March 4, 2020, because of her race and in retaliation of her complaints about racial harassment.

8.      On or about February 6, 2020, Mrs. Wright filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC), Charge No. 22A-2020-01269, alleging that Defendant and its agents harassed and subjected her to disparate treatment because of her race.

9.      On or about November 18, 2020, Mrs. Wright received her Right to Sue Notice from the EEOC.

10.     A true and accurate copy of Mrs. Wright's Charge and Right to Sue Notice are attached as Exhibit 1 and Exhibit 2, respectively.

11.     Wright has properly exhausted her administrative remedies pursuant to 29 U.S.C. § 626(e).

        Defendant

12.     Pickaway County Public Health and Pickaway County General Health District (collectively "Defendant") is a political subdivision conducting business at 110 Island Road, Suite C, Circleville, Ohio 43113.

13.     Defendant is combined health district that services all townships, villages, and municipalities located in Pickaway County, Ohio.

14.     Defendant administers programs for vital statistics, clinical health services, immunizations, emergency preparedness, communicable disease reporting and investigation, food safety inspections, nuisance investigation and other public health services.

15.     Defendant is tasked with protecting and improving the health of Pickaway County residents through the provision of quality public health services.

16.     Defendant is led by the Pickaway County's Board of Health (Board) which is comprised of seven members.

17.     The Board members at the time Mrs. Wright's was hired were Mike Wolford, Art Goodwin, Jeff Hallinin, Jay Elsea, Dr. Linda Iskra and Spencer Cheek.

## FACTS

18.     For nearly two decades Plaintiff Nasandra Wright has a successful career and experiences in public affairs, diversity and strategic organizational development which was dedicated to the enhancement of public health and safety. Mrs. Wright also has a bachelor's degree in chemistry from The Ohio State University, a Master's degree in Public Health and graduate certificates in Environmental Health, and Health Promotion, all from Florida International University. Mrs. Wright has taken courses towards the completion of an MBA from Wright State University.  It was this experience and educational qualifications that led Defendant's Pickaway County Public Health Department to hire Mrs. Wright as its Health Commissioner (Commissioner).

19.     Mrs. Wright was hired by the Board pursuant to a five year contract with an effective date of March 4, 2019 through to March 4, 2024 (Contract).

20.     Mrs. Wright was the first ethnic minority that Defendant had hired in its nearly 100 year existence.

21.     Per the Contract, Mrs. Wright's annual salary as Commissioner was Seventy Six Thousand, and Forty Four Dollars and eighty cents ($76,044.80) per year.

22.     The Contract between Mrs. Wright and Board states that the Commission is an unclassified employee and may be removed, suspended, or demoted at the will of the Board of Health subject to two-thirds vote of the Board following a hearing between the Board and the Commissioner. The Contract further states if the Commissioner is removed or demoted the Contract shall terminate.

4

23.     Based on her interview for the Commissioner position, Mrs. Wright understood that the Department was in need of a complete overhaul because it had been poorly funded, poorly staffed, and poorly managed for a number of years.

24.     As Health Commissioner, Mrs. Wright was tasked with raising Defendant's profile to become an efficient, effective public health and safety department. Mrs. Wright knew that this undertaking would not be an easy one as the Department's employees spent years having little to no accountability for carrying out their job responsibilities.

25.     On the day of her interview, Mrs. Wright saw Elaine Miller, Defendant's then Director of Nursing, Jere Marks, Defendant's Environmental Director, and Jimmie Davis, Defendant's Deputy Health Commissioner speaking in the hallway. As she walked by the three, Mrs. Wright heard one of them express concern stating, "They wouldn't hire a Black woman."

26.     Despite this racial tension in the atmosphere, Mrs. Wright was able to flourish in reshaping the Department because of her strong work ethic, her talent, her strong fortitude, and her willingness to continuously have higher expectations of her employees in carrying out their job responsibilities.

27.     By July 2019, Mr. Marks embarked on his own personal background investigation into Mrs. Wright. Mr. Marks delved into this investigation to provide the Board with a reason to terminate Mrs. Wright's employment.

28.     On completing his investigation, Mr. Marks made the Board aware of what he perceived to be issues with Mrs. Wright's resume. When his attempt was not successful, Mr. Marks provided the Board with documentation, several months after his resignation, in which he seemingly laments that Mrs. Wright was not fired due to his "findings."

29.     At the time of Mrs. Wright's hiring, the Department's Clinical Division was not properly staffed and was unable to meet the minimum requirements to handle a public health crisis.

30.     Mrs. Wright addressed this problem by contracting with Franklin County Public Health to provide infectious disease clinical services to Pickaway County. Mrs. Wright also implemented a clinical outreach program and immediately raised Defendant's profile in the community. The Board was pleased with Mrs. Wright's performance.

31.     In the interim, Mrs. Wright began hiring for various positions to build Defendant's clinical team in order to prepare the Defendant to provide its own infectious disease services. Mrs. Wright began recruiting for a Director of Nursing (DoN), as Elaine Miller, the pervious DoN unexpectedly retired shortly after Mrs. Wright was hired but prior to her starting in her role as Health Commissioner. Within the month of Mrs. Wright being hired, Ms. Miller joined the Board.

32.     Mrs. Wright hired Holly Slusher as the DoN, who resigned approximately two weeks later as a result of relatively low wage of the position.

33.     Mrs. Wright then hired Katherine Suchy; however, within the first week of her employment, Ms. Suchy began exhibiting open hostility towards Mrs. Wright by openly rolling her eyes and glaring at Mrs. Wright during meetings. Mrs. Wright addressed Ms. Suchy about her behavior, but Ms. Suchy did not stop.

34.     After one staff meeting, Mrs. Wright again addressed Ms. Suchy about her behavior and asked her to stop. Mrs. Wright explained that Ms. Suchy was aware that Mrs. Wright was Black at the time Mrs. Wright interviewed her. Mrs. Wright also explained to Ms. Suchy that she, Mrs. Wright, remained Black at the time she hired Ms. Suchy and she, Mrs. Wright, was unable to change the color of her skin.

35.     On or about July 21, 2019, Mrs. Wright finally reported Ms. Suchy's behavior to the Board explaining that she believed Ms. Suchy's hostility was based on Mrs. Wright's race. The Board took no action.

36.     Ms. Suchy resigned the day following Mrs. Wright's report to the Board.

37.     Not deterred, on or about August 12, 2019, Mrs. Wright hired Mrs. Susan Foster as the part-time public health nurse, with the expressed idea that Ms. Foster would be promoted to the DoN position.

38.     Unbeknownst to Mrs. Wright at the time of her hiring Mrs. Foster, Mrs. Foster and her husband were neighbors and good friends of Mike Wolford, the Board's President. Mrs. Foster was later promoted to the DoN position.

39.     Shortly thereafter, Mrs. Wright then hired Keli Caplinger, a full-time nurse.

40.     Mrs. Wright then hired Judy Blair, as the certified medial assistant.

41.     The hiring of Mrs. Foster, Ms. Caplinger, and Ms. Blair completed the clinical team. Once the team was completed, Mrs. Wright met with Ms. Foster several times and scheduled several trainings for Ms. Foster to equip her with necessary information and practical experience to launch Defendant's Infectious Disease Program (Program) in the event the county faced an epidemic or pandemic.

42.     On or about September 9, 2019, Mrs. Wright discussed the need for the training and the Program and explained that it was essential that Defendant be positioned to take on the primary responsibility for managing the Program so that Defendant could be adequately prepared to handle a crisis and not be dependent on another county's agency.

43.     On or about November 7, 2019, Mrs. Wright informed Mrs. Foster that Mrs. Foster needed to consult with Mrs. Wright before making any decision with any outside organization(s). Despite this directive, on November 21, 2019, Mrs. Foster decided to extend

7

the contractual services with Franklin County's Ohio Disease Reporting System without discussing the matter with Mrs. Wright.

44.    When Mrs. Wright questioned Mrs. Foster's extension of the contract, Mrs. Foster responded that she did not need to discuss every clinical matter with Mrs. Wright.

45.    Approximately one week later on or about November 27, 2019, Mrs. Foster cancelled training that Mrs. Wright had scheduled for the clinical team without consulting with Mrs. Wright.

46.    Mrs. Wright, with Mr. Steve Hawkins, attempted to discuss with Mrs. Foster the cancellation of the training on two separate occasions. On the first attempt, Mrs. Foster reacted in a belligerent and rude manner and insisted that she would not speak with Mrs. Wright and Mr. Hawkins without her subordinates present. On the second attempt, Mrs. Foster refused to speak with Mrs. Wright or Mr. Hawkins and ran them out of her office.

47.    Mrs. Wright immediately contacted Aaron Weare, an attorney employed by Clemans Nelson, a management consulting company employed by Defendant to provide support for human resources matters for his advice on how to proceed regarding this matter.

48.    Based on Defendant's policies, Mr. Weare drafted and provided Mrs. Wright a written reprimand to provide Ms. Foster. Mrs. Wright provided a copy of the reprimand to Mrs. Foster who refused to sign it. Mrs. Wright also issued a two-day suspension to Mrs. Foster for insubordination.

49.    Displeased with her discipline, Mrs. Foster directly contacted Mr. Wolford, the Board president, to complain of Mrs. Wright asking about the cancellation of training and the issuing of discipline.

50.    Mr. Wolford, and Board Member Nancie Bechtel held a mediation meeting with Mrs. Foster and Mrs. Wright in which Mrs. Wright was pressured into rescinding the two day

8

suspension. During the meeting, Ms. Bechtel told Mrs. Wright that Mrs. Wright was "not the right person for the job" and that Mrs. Wright should not be the Health Commissioner. Ms. Bechtel was not a member of the Board when Mrs. Wright was hired.

51.     During her tenure, Mrs. Wright tried to increase diversity and hired several minorities including three Black women to work in the Environmental Health. Since these individuals were hired, the Board began to more closely scrutinize Mrs. Wright's performance.

52.     In November 2019, Ms. Bechtel initiated, and the Board agreed, to issue an Employee Relations Audit/Survey to evaluate Mrs. Wright's performance. This survey was conducted by Mr. Weare from Clemans Nelson and was provided to Mrs. Foster and Mr. Hawkins. Mrs. Foster unsurprisingly provided a negative feedback, while Mr. Hawkins provided a positive feedback of Mrs. Wright's performance.

53.     At the December 5, 2019, meeting of the Board, Mrs. Wright was informed, by vote of the Board that it was no longer confident in her abilities to lead the Department. In this same meeting, the Board passed a resolution providing all its non-probationary employees a cost of living wage increase. Mrs. Wright was not a probationary employee, but she was excluded from receiving said wage increase

54.     Frustrated at the hostile environment that Mr. Wolford and Ms. Bechtel encouraged by openly undermining Mrs. Wright, Mrs. Wright reached out to Mayor Don McIlroy, the Chair of the Defendant's District Advisory Council (DAC), to report her belief that she was being discriminated against because of her race, and to seek his assistance in addressing the issues.

55.     On or about December 6, 2019, after receipt of Mrs. Wright's complaint, Mayor McIlroy had a conversation with Mrs. Bechtel in which Mrs. Bechtel claimed that the Board had received complaints for months regarding Mrs. Wright's "unethical conduct and lack of leadership." Mayor McIlroy asked for specific details to corroborate these statements. Mrs.

Bechtel responded that the Board was preparing a written evaluation and the details would be shared when they could be. Mrs. Bechtel did not provide such a report.

56.     On December 12, 2019, not having received the information from Mrs. Bechtel, Mayor McIlroy sent an email to the entire Board informing them that based on his investigation the Board should refrain from engaging in the day to day operations of the Department; that Mrs. Wright appeared prudent in documenting concerns regarding an employee's behavior after consulting with Clemans Nelson; and that if the Board did direct Mrs. Wright to rescind a written reprimand that was issued in consultation with Clemans Nelson, then the Board was directing the daily operation and it undermined Mrs. Wright's ability to lead her staff. Finally, Mayor McIlroy stated that based on his conversation with his fellow DAC members, all were in agreement that they were pleased with Mrs. Wright's performance as Health Commissioner.

57.     The Board held a meeting on December 17, 2019 to discuss Mrs. Wright's future employment with Defendant. All those in attendance at the meeting, including those that supported Mrs. Wright were asked to leave as soon as the meeting began.

58.     Although Mrs. Wright complained of experiencing racially discriminatory interactions with staff members as early as July 2019, Defendant and the Board did nothing to address the matter. There was no investigation, no meetings to address these concerns. The only investigation Defendant thought necessary was the one it engaged in after Mrs. Wright complaints of racial discrimination to Mayor McIllroy.

59.     Unable to find support that Mrs. Wright was an unfit Health Commissioner via the Employee Relations Audit/Survey, the Board then engaged the services of Carolyn Gutowski, not Mr. Weare, from Clemans Nelson to investigate Mrs. Wright's performance under the guise of an investigation into Mrs. Wright's misconduct.

60.     On realizing that Mrs. Wright had the continued support of the Mayor and members of the DAC, Mrs. Gutowski's investigation, and the Board's decision to terminate, rested on factually inaccurate accounts of incidents and focused on innuendos and suspicions.

61.     On or about February 4, 2020, the Board placed Mrs. Wright on paid administrative leave while it conducted its investigation.

62.     On March 4, 2020, without having a hearing between Mrs. Wright and the Board as required by the terms of Mrs. Wright's employment contract, the Board terminated Mrs. Wright's employment.

63.     On March 5, 2020, Ms. Miller, the former DoN that was party to the conversation that Defendant would not hire a Black woman, was named as the Defendant's Administrator and began performing the role Health Commissioner.

64.     Even after her termination, Defendant continued to engage in retaliatory conduct and would provide negative and/or derogatory references to potential employers that were interested in hiring Mrs. Wright. Mrs. Wright had to engage the services of a background check company who informed Mrs. Wright that Defendant did provide negative references and advised that she should hire the services of an attorney.

65.     Mrs. Wright did engage the services of an attorney to send Defendant a cease and desist letter. After receiving said letter, Defendant's attorney stated that Defendant would provide Mrs. Wright a neutral reference.

**COUNT I:**

**<u>RACE DISCRIMINATION IN VIOLATION OF TITLE VII</u>**

66.     Mrs. Wright restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

67.     Mrs. Wright was an "employee" as defined by Title VII.

68.     Defendant was an "employer" as defined by Title VII.

69.     Throughout her employment, Mrs. Wright was fully competent to perform her essential job duties.

70.     Defendant treated Mrs. Wright differently from similarly-situated employees based on her race.

71.     Specifically, Defendant discriminated against Mrs. Wright on the basis of her race when it allowed employee Ms. Suchy to respond in an aggressive and inappropriate manner towards Mrs. Wright including rolling her eyes at and glaring at Mrs. Wright in meetings. This behavior, which was not engaged in with others, demonstrates Ms. Suchy's discriminatory motive based on Mrs. Wright's race.

72.     Defendant also discriminated against Mrs. Wright on the basis of her race when it indulged Mr. Marks' personal background investigation into Mrs. Wright's credentials after the Defendant had already completed its own background check. Mr. Marks was party to a conversation in which it was stated that Defendant would not hire a Black woman. Mr. Marks then going to perform his own background check demonstrated his discriminatory motive based on Mrs. Wright's race.

73.     Defendant again discriminated against Mrs. Wright when it began scrutinizing her job performance more closely after she hired several minority employees including three Black women. The Board, specifically, Mr. Wolford and Mrs. Bechtel undermined Mrs. Wright by getting involved with the day to day operations of the Department. The Board did not engage in such behavior with previous Health Commissioners who were White males. This disparate treatment of Mrs. Wright demonstrates the discriminatory motive based on Mrs. Wright's race.

74.     Defendant further failed to provide Mrs. Wright, who was a non-probationary employee, with a cost of living wage increase as it did for all other non-probationary employees.

75.     After terminating Mrs. Wright's employment, Defendant replaced her with Elaine Miller, a white woman who was party to the conversation that Defendant would not hire a Black woman.

76.     Defendant violated Title VII when it discriminated against Wright on the basis of her race.

77.     Defendant is liable for the acts and omissions of its agents and employees.

78.     The race-related employment practices and other acts or omissions of Defendant and its agents, supervisors, and employees reflect Defendant's reckless, willful, and wanton indifference or hostility to Mrs. Wright's protected employment rights and status, directly and proximately resulting in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and Mrs. Wright's attorney's fees in bringing this action.

## COUNT II:

## RACE DISCRIMINATION IN VIOLATION OF R.C. § 4112.02(A)

79.     Mrs. Wright restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

80.     Defendant was an employer as defined by R.C. § 4112.01(A)(2).

81.     Mrs. Wright was an employee as defined by R.C. §4112.01(A)(3).

82.     Throughout her employment, Mrs. Wright was fully competent to perform her essential job duties.

83.     Defendant treated Wright differently from similarly-situated employees based on her race.

84.     Specifically, Defendant discriminated against Mrs. Wright on the basis of her race when it allowed employee Ms. Suchy to respond in an aggressive and inappropriate manner towards Mrs. Wright including rolling her eyes at and glaring at Mrs. Wright in meetings. This behavior, which was not engaged in with others, demonstrates Ms. Suchy's discriminatory motive based on Mrs. Wright's race.

85.     Defendant also discriminated against Mrs. Wright on the basis of her race when it indulged Mr. Marks' personal background investigation into Mrs. Wright's credentials after the Defendant had already completed its own background check. Mr. Marks was party to a conversation in which it was stated that Defendant would not hire a Black woman. Mr. Marks then going to perform his own background check demonstrated his discriminatory motive based on Mrs. Wright's race.

86.     Defendant again discriminated against Mrs. Wright when it began scrutinizing her job performance more closely after she hired several minority employees including three Black women. The Board, specifically, Mr. Wolford and Mrs. Bechtel undermined Mrs. Wright by getting involved with the day to day operations of the Department. The Board did not engage in such behavior with previous Health Commissioners who were White males. This disparate treatment of Mrs. Wright demonstrates the discriminatory motive based on Mrs. Wright's race.

87.     Defendant further failed to provide Mrs. Wright, who was a non-probationary employee, with a cost of living wage increase as it did for all other non-probationary employees.

88.     After terminating Mrs. Wright's employment, Defendant replaced her with Elaine Miller, a white woman who was party to the conversation that Defendant would not hire a Black woman.

89.     Defendant violated R.C. §4112.02 when it discriminated against Wright on the basis of her race.

90.     As a direct and proximate cause of Defendant's wrongful conduct, Wright has suffered and will continue to suffer damages.

## COUNT III:

## <u>COLOR DISCRIMINATION IN VIOLATION OF TITLE VII</u>

91.     Mrs. Wright restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

92.     Mrs. Wright was an "employee" as defined by Title VII.

93.     Defendant was an "employer" as defined by Title VII.

94.     Throughout her employment, Mrs. Wright was fully competent to perform her essential job duties.

95.     Defendant treated Mrs. Wright differently from similarly-situated employees based on her color.

96.     Specifically, Defendant also discriminated against Mrs. Wright on the basis of her color when it allowed employee Ms. Suchy to respond in an aggressive and inappropriate manner towards Mrs. Wright, including rolling her eyes at and glaring at Mrs. Wright in meetings. This behavior demonstrates Ms. Suchy's discriminatory motive based on Mrs. Wright's color.

97.     Defendant further discriminated against Mrs. Wright on the basis of her color when it indulged Mr. Marks' personal background investigation into Mrs. Wright's credentials after the Defendant had already completed its own background check. Mr. Marks was party to a conversation in which it was stated that Defendant would not hire a Black woman. Mr. Marks

then going to perform his own background check demonstrated his discriminatory motive based on Mrs. Wright's color.

98.     Defendant discriminated against Mrs. Wright on the basis of her color when it allowed its Board to interfere with the daily operations of the Department and undermine Mrs. Wright's ability to lead her team because of her color. As the first and only Black Health Commissioner, Mrs. Wright was subjected to Mr. Wolford and Mrs. Bechtel pressuring her to change personnel decisions although they were arrived at with the appropriate guidance of Defendant's human resources consultants. The Board did not engage in such behavior with previous Health Commissioners who were White males. This disparate treatment of Mrs. Wright demonstrates the discriminatory motive based on Mrs. Wright's color.

99.     Defendant further discriminated against Wright on the basis of her color when it began scrutinizing her job performance more closely after she hired several minority employees including three Black women. The Board, specifically, Mr. Wolford and Mrs. Bechtel undermined Mrs. Wright by getting involved with the day to day operations of the Department. This disparate treatment of Mrs. Wright demonstrates the discriminatory motive based on Mrs. Wright's color.

100.    After terminating Mrs. Wright's employment, Defendant replaced her with Elaine Miller, a White woman who was party to the conversation that Defendant would not hire a Black woman.

101.    Defendant violated Title VII when it discriminated against Mrs. Wright on the basis of her color.

102.    Defendant is liable for the acts and omissions of its agents and employees.

103.    The color-related employment practices and other acts or omissions of Defendant and its agents, supervisors, and employees reflect Defendant's reckless, willful, and wanton

indifference or hostility to Mrs. Wright's protected employment rights and status, directly and proximately resulting in such damages as may be proven at trial, including but not limited to lost income and benefits; lost employment opportunities; psychological, emotional, and mental anguish; distress, humiliation, embarrassment, and degradation; pain and suffering; and Mrs. Wright's attorney's fees in bringing this action.

## COUNT IV:

## COLOR DISCRIMINATION IN VIOLATION OF R.C.  § 4112.02(A)

104.    Mrs. Wright restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

105.    Defendant was an employer as defined by R.C. § 4112.01(A)(2).

106.    Wright was an employee as defined by R.C. §4112.01(A)(3).

107.    Throughout her employment, Wright was fully competent to perform her essential job duties.

108.    Defendant treated Mrs. Wright differently from similarly-situated employees based on her color.

109.    Specifically, Defendant also discriminated against Mrs. Wright on the basis of her color when it allowed employee Ms. Suchy to respond in an aggressive and inappropriate manner towards Mrs. Wright, including rolling her eyes at and glaring at Mrs. Wright in meetings. This behavior demonstrates Ms. Suchy's discriminatory motive based on Mrs. Wright's color.

110.    Defendant further discriminated against Mrs. Wright on the basis of her color when it indulged Mr. Marks' personal background investigation into Mrs. Wright's credentials after the Defendant had already completed its own background check. Mr. Marks was party to a conversation in which it was stated that Defendant would not hire a Black woman. Mr. Marks

then going to perform his own background check demonstrated his discriminatory motive based on Mrs. Wright's color.

111.    Defendant discriminated against Mrs. Wright on the basis of her color when it allowed its Board to interfere with the daily operations of the Department and undermine Mrs. Wright's ability to lead her team because of her color. As the first and only Black Health Commissioner, Mrs. Wright was subjected to Mr. Wolford and Mrs. Bechtel pressuring her to change personnel decisions although they were arrived at with the appropriate guidance of Defendant's human resources consultants. The Board did not engage in such behavior with previous Health Commissioners who were White males. This disparate treatment of Mrs. Wright demonstrates the discriminatory motive based on Mrs. Wright's color.

112.    Defendant further discriminated against Wright on the basis of her color when it began scrutinizing her job performance more closely after she hired several minority employees including three Black women. The Board, specifically, Mr. Wolford and Mrs. Bechtel undermined Mrs. Wright by getting involved with the day to day operations of the Department. This disparate treatment of Mrs. Wright demonstrates the discriminatory motive based on Mrs. Wright's color.

113.    After terminating Mrs. Wright's employment, Defendant replaced her with Elaine Miller, a white woman who was party to the conversation that Defendant would not hire a Black woman.

114.    Defendant violated R.C. §4112.02 when it discriminated against Mrs. Wright on the basis of her color.

115.    As a direct and proximate cause of Defendant's wrongful conduct, Mrs. Wright has suffered and will continue to suffer damages.

## COUNT V:

## RETALIATION IN VIOLATION OF TITLE VII

116.    Mrs. Wright restates each and every prior paragraph of this complaint, as if it were fully restated herein.

117.    As a result of the Defendant's discriminatory conduct described above, Mrs. Wright complained about the racial harassment she was experiencing.

118.    Specifically, Wright complained by informing the Board of her interactions with Ms. Suchy. The Board did not take action but later on declined to provide Mrs. Wright with the cost-of-living wage increase it provided all other non-probationary employees.

119.    Mrs. Wright then complained to Mayor McIlroy, chair of the DAC which oversees the Board, and outlined majority of the experiences she had to date while working for Defendant which created a hostile work environment and were racially motivated.

120.    In response to Wright's complaint of discrimination, Defendant retaliated against her by launching a full investigation into Mrs. Wright's job performance, suspended her with pay, and then terminating her employment without a hearing as required by her Contract.

121.    After terminating Mrs. Wright's employment, Defendant continued with its retaliatory action by providing negative and derogatory references to potential new employers that completed reference checks.

122.    Defendant's actions were retaliatory in nature based on Mrs. Wright's opposition to the unlawful discriminatory conduct.

123.    Thus, Defendant's actions violated 42 U.S.C § 2000e-3(a).

124.    As a direct and proximate cause of Defendant's retaliatory discrimination against and termination of Wright, her suffered and will continue to suffer damages.

## COUNT VI:

## RETALIATION IN VIOLATION OF R.C. §4112.02(I)

125.    Mrs. Wright restates each and every prior paragraph of this complaint, as if it were fully restated herein.

126.    As a result of the Defendant's discriminatory conduct described above, Mrs. Wright complained about the racially harassing and discriminatory behavior she was experiencing.

127.    Specifically, Wright complained by informing the Board of her interactions with Ms. Suchy. The Board did not take action but later on declined to provide Mrs. Wright with the cost-of-living wage increase it provided all other non-probationary employees.

128.    Mrs. Wright then complained to Mayor McIlroy, chair of the DAC which oversees the Board, and outlined majority of the experiences she had to date while working for Defendant which created a hostile work environment and were racially motivated.

129.    In response to Wright's complaint of discrimination, Defendant retaliated against her by launching a full investigation into Mrs. Wright's job performance, suspended her with pay, and then terminating her employment without a hearing as required by her Contract.

130.    After terminating Mrs. Wright's employment, Defendant continued with its retaliatory action by providing negative and derogatory references to potential new employers that completed reference checks.

131.    Defendant's actions were retaliatory in nature based on Mrs. Wright's opposition to the unlawful discriminatory conduct.

132.    Defendant's actions violated R.C. §4112.02(I), which prohibits employers from retaliating against employees who oppose unlawful discriminatory conduct.

133.    As a direct and proximate cause of Defendant's retaliatory discrimination against and termination of Wright, she suffered and will continue to suffer damages.

## COUNT VII:

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

134. Mrs. Wright restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

135. A clear public policy exists and is manifested in Federal statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because she engages in protected activity under Ohio law.

136. Defendant's termination of Mrs. Wright jeopardizes these public policies.

137. Defendant's termination of Mrs. Wright was motivated by conduct related to these public policies.

138. Defendants had no overriding business justification for terminating Mrs. Wright.

139. As a direct and proximate cause of Defendants' wrongful conduct, Mrs. Wright suffered and will continue to suffer damages.

## COUNT VIII:

### RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. §1981

140. Mrs. Wright restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

141. Defendant intentionally deprived Mrs. Wright of the same rights as are enjoyed by white citizens to the creation, performance, enjoyment, and all benefits and privileges, of her contractual employment relationship.

142. Specifically, Defendant discriminated against Mrs. Wright on the basis of her race when it allowed employee Ms. Suchy to respond in an aggressive and inappropriate manner towards Mrs. Wright including rolling her eyes at and glaring at Mrs. Wright in meetings. This behavior,

which was not engaged in with others, demonstrates Ms. Suchy's discriminatory motive based on Mrs. Wright's race.

143.    Defendant also discriminated against Mrs. Wright on the basis of her race when it indulged Mr. Marks' personal background investigation into Mrs. Wright's credentials after the Defendant had already completed its own background check. Mr. Marks was party to a conversation in which it was stated that Defendant would not hire a Black woman. Mr. Marks then going to perform his own background check demonstrated his discriminatory motive based on Mrs. Wright's race.

144.    Defendant again discriminated against Mrs. Wright when it began scrutinizing her job performance more closely after she hired several minority employees including three Black women. The Board, specifically, Mr. Wolford and Mrs. Bechtel undermined Mrs. Wright by getting involved with the day to day operations of the Department. The Board did not engage in such behavior with previous Health Commissioners who were White males. This disparate treatment of Mrs. Wright demonstrates the discriminatory motive based on Mrs. Wright's race.

145.    Defendant further failed to provide Mrs. Wright, who was a non-probationary employee, with a cost-of-living wage increase as it did for all other non-probationary employees.

146.    After terminating Mrs. Wright's employment, Defendant replaced her with Elaine Miller, a White woman who was party to the conversation that Defendant would not hire a Black woman.

147.    As a direct and proximate cause of Defendant's conduct, Wright suffered and will continue to suffer damages.

**COUNT IX:**

**VIOLATION OF 5 U.S.C. 2302.**

148. Wright restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

149. Defendant retaliated against Wright by terminating her employment based on her complaints regarding this conduct.

150. Defendant's termination of Wright was in violation of 5 U.S.C. 2302.

151. As a direct and proximate cause of Defendant's conduct, Wright suffered and will continue to suffer damages.

**DEMAND FOR RELIEF**

WHEREFORE, Mrs. Wright demands from Defendant the following:

(a)     Issue a permanent injunction:

   (i)     Requiring Defendant to abolish discrimination, harassment, and retaliation;

   (ii)    Requiring allocation of significant funding and trained staff to implement all changes within two years;

   (iii)   Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;

   (iv)    Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and

(v)     Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

(b)     Issue an order requiring Defendant to restore Mrs. Wright to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(c)     An award against Defendant for economic damages for all back and future lost wages, compensation, lost income, fringe benefits, retirement and pension plans;

(d)     An award for compensatory damages for pain, suffering, stress, humiliation, mental anguish, emotional harm and personal injury and physical sickness, medical expenses, as well as damage to her reputation and loss of income stemming therefrom;

(e)     An award of reasonable attorney's fees and non-taxable costs for Mrs. Wright claims as allowable under law;

(f)     An award of the taxable costs of this action; and

(g)     An award of such other relief as this Court may deem necessary and proper.


Respectfully submitted,

_____
Patrice K. Tisdale (0092437)
TISDALE LEGAL GROUP, PLLC
Phone: (201) 450-6475
Email: ptisdale@reallawesq.com
*Attorney For Plaintiff*

24

## JURY DEMAND

Plaintiff Nasandra Wright demands a trial by jury by the maximum number of jurors permitted.

_____
Patrice K. Tisdale (0092437)