**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**NASANDRA WRIGHT,**

      **Plaintiff,**

    **v.**                              **Civil Action 2:21-cv-684**
                                          **Magistrate Judge Kimberly A. Jolson**

**PICKAWAY COUNTY GENERAL
HEALTH DISTRICT,**

      **Defendant.**

## OPINION AND ORDER

This matter, in which the parties have consented to the jurisdiction of the Magistrate Judge (Doc. 11), is before the Court on Defendant's Motion for Summary Judgment (Doc. 23). The Motion is **GRANTED.**

### I.    BACKGROUND

In 2016, the Pickaway County Board of Health ("Board") sought a new Health Commissioner. Plaintiff Nasandra Wright, who holds a master's degree in Public Health and has experience as a licensed sanitarian, applied for the job. (*See* Doc. 13 at ¶ 19). (Doc. 23-2 (Plaintiff's resumé)). The Board chose candidates to interview, and Plaintiff made the cut. Ultimately, given her "excellent" resumé and interview, the Board chose Plaintiff as the Department's new Health Commissioner. (Doc. 23-1 at ¶ 3).

Plaintiff signed a five-year employment contract, which included a term that she may be terminated "at the will of the [Board] subject to two-thirds vote of the Board following a hearing between the Board and the Commissioner" (Doc. 13 at ¶ 23). As head of the Health Department, Plaintiff was "responsible for the direct supervision of the division directors" and was "the primary

representative of the [D]epartment in the community . . . ." (Doc. 23-54 at 1). To empower her to do the job, the Board delegated authority to her to make "all decisions regarding personnel that fall within the budget and are compliant with local, state, and federal laws and regulations." (*Id.*).

At the start of Plaintiff's tenure, Elaine Miller transitioned from her role as Director of Nursing to serve as a member of the Board. (Doc. 23-4 at 1:2 (Elaine Miller affidavit)). That meant Plaintiff was tasked immediately with hiring a new Director of Nursing, an important role within the Department. (*See* Doc. 23-3 at 2, 9). She hired Holly Slusher, but Ms. Slusher quit three weeks later. (Doc. 23-3 at 9 (Plaintiff deposition)). When asked why Ms. Slusher's tenure was so short, Plaintiff testified that Ms. Slusher quit because she has "a history of quitting." (*Id.*).

Plaintiff then hired Katherine Suchy to replace Ms. Slusher as Director of Nursing. (*Id.*). But Ms. Suchy also quickly resigned after Plaintiff claimed Ms. Suchy "engaged in conduct that . . . was racially motivated" by "star[ing]" and "glar[ing]" at Plaintiff. (*Id.* at 3, 9; Doc. 23-6 at 3:13). Around this time, other matters were percolating, too. The Board learned that Plaintiff did not have an MBA as her resumé implied—but had instead taken some business classes. (Doc. 23-1 at 2:9). The Board also found out that Plaintiff had let her sanitarian license lapse. (*See* Doc. 27-2 at ¶ 29).

Following Ms. Suchy's departure, Plaintiff hired Susan Foster, making her the third Director of Nursing in six months. (Doc. 23-15 at 1:2 (Foster affidavit)). Immediately, there was friction. Ms. Foster felt unsupported in the role, while Plaintiff saw Ms. Foster as "defiantly insubordinate." (*Id.* at 1:5; Doc. 27-2 at 2:10 (Plaintiff affidavit)). After months of persistent disagreement between Plaintiff and Ms. Foster, matters came to a head in November 2019. (*See id.* at 3:13–14). Plaintiff scheduled a training for Ms. Foster to learn the state-mandated Ohio Disease Reporting System. (*Id.* at 3:15). Ms. Foster attended the training, but Plaintiff says that

2

Ms. Foster later told her that she did not pay attention.  (*Id.*).  So Plaintiff scheduled a repeat training, which Ms. Foster attended.  (*Id.*).  Plaintiff then scheduled the same training a third time after, according to Plaintiff, "no progress had been made[.]"  (*Id.*).  Ms. Foster refused to attend the training a third time.  (*Id.*; Doc. 23-15 at 2:10).  At this point, Plaintiff claims that she "could no longer tolerate Ms. Foster's insubordination and concluded that disciplinary action was necessary . . . ."  (Doc. 27-2 at 3:16).

The next day, Plaintiff went to Ms. Foster's office to discuss the missed training.  (*Id.* at 3:17).  Plaintiff brought Fiscal Officer Steven Hawkins with her to serve "as a witness."  (Doc. 23-15 at 2:12).  Plaintiff says that Ms. Foster then "started yelling and behaving rudely . . . ."  (Doc. 27-2 at 3:17).  Ms. Foster recalls the meeting differently.  She says that Plaintiff "barged" into her office and accused Ms. Foster of being "belligerent . . . ."  (Doc. 23-15 at 2:11).  After Mr. Hawkins "proceeded to video the meeting . . . a couple of minutes later[,] [Ms. Foster] ran [Plaintiff and Mr. Hawkins] out of her office."  (Doc. 27-2 at 3:17).  Ms. Foster says she was "frightened," so she contacted Board members Mike Wolford and Nancie Bechtel and relayed the interaction with Plaintiff to them.  (Doc. 23-15 at 2:12–13:13).  Mr. Wolford and Ms. Bechtel scheduled a meeting with Ms. Foster and Plaintiff for the next day.  Plaintiff responded by formally reprimanding Ms. Foster and suspending her for two days without pay.  (Doc. 23-15 at 3:14).

At the meeting the next day, Mr. Wolford and Ms. Betchel told Ms. Foster that "it was improper for [Ms. Foster] to have canceled the training and the discipline was warranted."  (*Id.* at 3:16 (Foster affidavit)).  But they also told Plaintiff "that the way she approached [Ms. Foster] in [her] office was not appropriate and was intimidating."  (*Id.*).  They directed Plaintiff to rescind the suspension regarding Ms. Foster's "alleged 'insubordination" because it violated policy.  (*Id.*).  After the meeting, Plaintiff sent a letter to Mayor Don McIlroy, the Chair of the Pickaway County

General Health District Advisory Council, "to complain that [she] was being discriminated against based on [her] race."  (Doc. 27-2 at 4:19).

The relationship with Plaintiff and Ms. Foster continued to sour.  Plaintiff required Ms. Foster to submit a daily agenda to keep tabs on her.  (Doc. 23-15 at 5:29).  Then, Plaintiff called the Sheriff's Department after Ms. Foster followed her into the parking lot and asked Plaintiff to sign her timesheet.  (Doc. 23-36).  She demoted Ms. Foster without Board approval, in violation of policy.  (Doc. 23 at 11 (citing 23-15, 23-37, 23-32).  And, when Ms. Foster did not vacate her office fast enough, Plaintiff called the Sheriff's Department to report a "disturbance."  (Docs. 23-15 at 5:31; 23-39).

In December 2019, the Board received more negative news about Plaintiff.  Jessica Rooney, Plaintiff's administrative assistant, filed a formal complaint on December 6, 2019, saying that Plaintiff said, "if she 'didn't want [Ms. Rooney] to be the Admin Assistant anymore' that [sic] she would 'get rid of [Ms. Rooney].'"  (Doc. 23-40).  Ms. Rooney said she felt "threatened by this."  (*Id.*).  She complained again on December 19, 2019, saying that Plaintiff makes her "feel intimidated and scared," and, among other things, "incompetent."  (Doc. 23-41).  Ms. Rooney later rescinded the complaints, saying she was "sucked into some drama . . . ."  (Doc. 27-12).  But, under oath, Ms. Rooney testified that she and others experienced "constant abuse" and fear of retaliation.  (Doc. 23-38 at 4:17).

Jere Marks, Environmental Director, also mentioned Plaintiff in his resignation letter dated December 4, 2019.  (Doc. 23-10).  He said:

> the driving force behind [Mr. Marks'] resignation was [Plaintiff's] willingness to accuse people of being a racist and sexist without anything to support it. A formal accusation is all it takes to destroy someone's career in today's society. The hostile work environment as well as the difficulty in retaining employees were also major factors in [his] decision to resign. It is nearly impossible to lead an organization

> when trust and confidence in the leader has been eroded to the point that it does not exist. The employees and the organization suffer under these circumstances.

(*Id.* at 4).

At this point, the Board had received a total of six formal and informal complaints about Plaintiff. (*See* Docs. 23-8 (Sanitarian exit interview), 23-9 (Hartung resignation letter), 23-10 (Marks resignation letter), 23-40 (Rooney first complaint), 23-41 (Rooney second complaint), 23-15 at 3:14 (Foster affidavit)). So the Board took action. It went into executive session on January 9, 2020, to complete Plaintiff's performance review. (Doc. 23-42). In brief, the review noted that Plaintiff put significant effort into improving the health of Pickaway County residents but needed to improve upon communication because she "belittle[d] staff." (Doc. 23-43 at 1–2). The evaluation also highlighted that Plaintiff lacked consistency in good judgment, citing the "incident in which she called the Sherriff's Office to send an officer to force an employee whom she had just demoted to immediately relocate to a new office within the building. These types of actions can be perceived by staff as overly punitive and/or heavyhanded [sic]." (*Id.* at 4).

The allegations of Plaintiff's workplace misconduct were enough that, on February 4, 2020, the Board placed her on paid administrative leave and launched an independent investigation. (Docs. 23-44, 23-45). The investigator was tasked with determining "the source of the discord within Pickaway Health[,]" in light of "the veritable flood of complaints" against Plaintiff. (Doc. 23-1 at ¶ 14).

During her administrative leave and while the investigation was under way, Plaintiff filed "a Charge of Discrimination with the United States Equal Employment Opportunity Commission (EEOC), Charge No. 22A-2020- 01269, alleging that Defendant and its agents harassed and subjected her to disparate treatment because of her race." (Doc. 13 at ¶ 9). In her Charge of Discrimination, Plaintiff chiefly cited a time before she was hired to serve as Health Commissioner

as evidence of race discrimination. When Plaintiff was leaving her interview with the Board, she overheard three individuals speaking in the hallway, with one saying, "[t]hey wouldn't hire a Black woman." (Doc. 13 at ¶ 26). Plaintiff states that she later found the participants of that conversation to be then-Director of Nursing Elaine Miller, Environmental Director Jere Marks, and Deputy Health Commissioner Jimmie Davis. (*Id.*).

On March 4, 2020, the Board reviewed the results of the investigation, which recommended the Board "implement[] concepts and ideas regarding the communication between departments and addressing the personality conflicts within the agency" so as to "solve what appears to be the most common employee concern that can be addressed with the least significant financial or budgetary impact." (Docs. 23-48; 27-15 at 21). And, at the same board meeting, the Board terminated Plaintiff. (Doc. 23-48).

Ultimately, Plaintiff received her Right to Sue Notice from the EEOC in November 2020. (*Id.* at ¶ 10). Next, Plaintiff initiated this action against Defendant, alleging she was terminated because of her race and was retaliated against for making complaints of unlawful discrimination, among other claims. (Doc. 1). Defendant now brings the instant Motion for Summary Judgment, which is fully briefed and ripe for review. (Docs. 23, 26, 27, 31).

## II. STANDARD

Summary judgment is granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is appropriately entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When a defendant shows there is insufficient evidence to support any element of the plaintiff's claim and

6

moves for summary judgment, the burden shifts to the plaintiff to demonstrate a genuine issue for trial on which a reasonable jury could return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Evidence is viewed in the light most favorable to the nonmoving party, meaning that "any direct evidence offered by the [nonmovant] in response to a summary judgment motion must be accepted as true." *Muhammad v. Close*, 379 F.3d 413, 416 (6th Cir. 2004), *citing Liberty Lobby*, 477 U.S. at 251–52, and *Adams v. Metiva*, 31 F.3d 375, 382 (6th Cir. 1994). Ultimately, the Court asks "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251–52.

## III.  DISCUSSION

Plaintiff brings five claims related to her termination: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964, Ohio Revised Code (O.R.C) § 4112.01(A), and 42 United States Code (U.S.C.) § 1981; (2) retaliation in violation of O.R.C. § 4112.02(I); (3) wrongful termination in violation of public policy; (4) violation of 5 U.S.C. § 2302; and (5) breach of contract in violation of O.R.C. § 2305.06. As will be set forth below, the Court finds that no reasonable jury could return a verdict in Plaintiff's favor for any of the claims and thus **GRANTS** Defendant's Motion for Summary Judgment (Doc. 23).

### A.  Race Discrimination Claim

Plaintiff alleges that Defendant discriminated against her on the bases of her race and color, in violation of Title VII of the Civil Rights Act of 1964, O.R.C. § 4112.01(A), and 42 U.S.C. § 1981. (Doc. 13 at 1, 12–19). In many cases, including this one, there is no direct evidence of discrimination. *See Hall v. Michigan State Police Dep't*, 290 F. App'x 913, 916 (6th Cir. 2008)

("Direct evidence is proof that, if believed, compels the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."). In the absence of direct evidence, employment discrimination claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Boutros v. Canton Reg. Transit Auth.*, 997 F.2d 198, 202–03 (6th Cir. 1993) (applying *McDonnell Douglas* framework to claim under Title VII); *Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 66 Ohio St. 2d 192, 197 (Ohio 1981) (applying *McDonnell Douglas* framework to claim under O.R.C. Chapter 4112); *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001) (applying *McDonnell Douglas* framework to claim under § 1981).

Under *McDonnell Douglas*, Plaintiff bears the burden of establishing a threshold case of discrimination. 411 U.S. 792, 802 (1973). If successful, the burden shifts to Defendant to articulate a legitimate reason for its decision. *Id.* If Defendant does so, Plaintiff must show that the stated reason is pretextual cover for discrimination. *Id.* at 803–07.

      i.  <u>Prima Facie Case</u>

To establish a claim of race discrimination under Title VII, O.R.C. § 4112.01(A), and 42 U.S.C. § 1981, Plaintiff must show: "(1) membership in a protected class; (2) that she suffered an adverse action; (3) that she was qualified for the position; and (4) that she was replaced by, or treated differently than, someone outside the protected class." *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 828 (6th Cir. 2000) (citing *McDonnell*, 411 U.S. at 802).

Only the third prong of the prima facie case is disputed here. Defendant says Plaintiff was never qualified to be Health Commissioner. (Doc. 23 at 20–21). In determining whether a plaintiff is "qualified," the Court focuses on "objective qualifications"—like "'education, experience in the relevant industry, and demonstrated possession of the required general skills.'" *Bailey v. Papa*

*John's USA, Inc.*, 211 F. App'x 417, 421 (6th Cir. 2006) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003)).

> Helpfully, the state statute governing the appointment of health commissioners provides:

> [t]he person appointed as commissioner shall be a licensed physician, licensed dentist, a licensed veterinarian, licensed podiatrist, licensed chiropractor, or the holder of a master's degree in public health or an equivalent master's degree in a related health field as determined by the members of the board of health in a general health district. He [she] shall be secretary of the board, and shall devote such time to the duties of his [her] office as may be fixed by contract with the board. The commissioner shall be the executive officer of the board and shall carry out all orders of the board and of the [Ohio] department of health. He [she] shall be charged with the enforcement of all sanitary laws and regulations in the district. The commissioner shall keep the public informed in regard to all matters affecting the health of the district.

> (*Id.* (citing Ohio Rev. Code. § 3709.11)).

Per Plaintiff's resumé, she obtained a master's degree in public health and, at some point, was a licensed sanitarian. (Doc. 23-2 at 3). She worked in public health for approximately eight years before becoming Health Commissioner of Pickaway County. (*Id.* at 1–2). She had other experience, too. She had worked for non-governmental organizations in health-related roles and had served as an administrator or manager for over four years. (*Id.*). Given her graduate degree in public health and years of relevant experience, Plaintiff was qualified to be Health Commissioner under the statutory rubric. In fact, Defendant does not say otherwise.

Instead, Defendant says an additional qualification was needed. Relying on the job posting, Defendant argues that only a holder of an Ohio Medical License could have been a qualified candidate for Health Commissioner. It is true that, as posted, the job description stated that applicants must be a licensed M.D. or D.O. (Doc. 23-54 at 1). But the description later cites the statutory requirements for the position, saying that a "licensed physician, licensed dentist, a licensed veterinarian, licensed podiatrist, licensed chiropractor, or the holder of a master's degree

9

in public health or an equivalent master's degree in a related health field as determined by the members of the board of health in a general health district" can be Health Commissioner.  (*Id.*).  In other words, the job description is ambiguous—or at the very least, not entirely clear.

Even more important, Defendant hired Plaintiff to be Health Commissioner even though she was without a medical license.  At no point did Plaintiff represent to the Board that she was a licensed physician.  Considering that Defendant seemingly did not enforce the medical license requirement in its hiring process, the Court will not, as a matter of law, deem that qualification necessary.  *See George v. Youngstown State Univ.*, 966 F.3d 446, 465 (6th Cir. 2020) (holding that the district court was correct in finding that a reasonable juror could conclude plaintiff was qualified for the position when the evidence was unclear as to what credentials were required for the job and the employer considered equivalent credentials in evaluating candidates during the hiring process).

Ultimately, at summary judgment, evidence is viewed in the light most favorable to the nonmoving party, *Muhammad*, 379 F.3d at 416 (citing *Liberty Lobby*, 477 U.S. at 251–52).  Here, that is Plaintiff.  She has demonstrated that she met the statutory minimum requirements to be a health commissioner in Ohio.  (*See* Docs. 23-2, 23-54).  A reasonable jury thus could conclude that she was qualified to be Health Commissioner even without a medical license, and Defendant is not deserving of summary judgment on the prima facie case.

## ii.  Legitimate, nondiscriminatory reason for adverse employment action

Though Plaintiff has presented enough evidence to bring her prima facie case to a jury, Defendant still has an opportunity to succeed on summary judgment by offering a legitimate, nondiscriminatory reason for Plaintiff's termination.  Defendant provides two reasons.  First, Defendant says it fired Plaintiff because she was unable to get along with coworkers and

10

subordinates. Second, it says Plaintiff violated "many Pickaway Health policies[,]" such as "providing false information, making a false statement committing a fraudulent act, or withholding pertinent information in the employment application process" and "dishonesty or dishonest acts . . . ." (Doc. 23 at 21, 23). In particular, it says that Plaintiff misrepresented on her resumé that she had obtained her MBA and had an active sanitarian license. (*Id.* at 23). Additionally, Defendant offers evidence that Plaintiff failed to follow policies when handling personnel matters.

a.      Personnel Difficulties

From the start, Plaintiff was unable to get along with coworkers and subordinates. (Doc. 23 at 21–24). Time and again, the Sixth Circuit has found that an employee's inability to work with others is a legitimate, nondiscriminatory reason compelling termination and therefore not subject to the Court's second guessing. *Adams v. Tenn. Dep't of Fin. & Admin.*, 179 Fed. Appx. 266, 274 (6th Cir. 2006) (finding that plaintiff's difficulty working with others and "blatant insubordination" were legitimate, nondiscriminatory reasons for disciplinary action); *Campbell v. Hamilton Cty.*, 23 F. App'x 318, 326–27 (6th Cir. 2001) (concluding that an employee's obstinate nature and refusal to subject themself to supervisory oversight are legitimate grounds for an adverse employment action); *Gregory v. Chrysler Corp.*, No. 97-4442, 1999 U.S. App. LEXIS 8025 at *12 (6th Cir. April 28, 1999) (ruling that an employee's inability to work well with others was a legitimate, nondiscriminatory reason for adverse employment action). This is in part because [c]ourts are not intended to act as 'super personnel departments to second guess an employer's facially legitimate business decisions.'" *Adams*, 179 F. App'x at 272 (*citing Bush v. Am. Honda Motor Co.*, 227 F. Supp. 2d 780, 797 (S.D. Ohio 2002)).

Here, Defendant has offered considerable evidence of Plaintiff's relationship conflicts. For example, Plaintiff's administrative assistant, Jessica Rooney, formally complained about Plaintiff.

11

(Docs. 23-40; 23-41).  Using the County's Human Resources process, Ms. Rooney filed two complaints about Plaintiff when she "finally couldn't handle the constant abuse of [herself] and others."  (Doc. 23-38 at 4, ¶ 17 (Rooney affidavit)).  Plaintiff suggests that these complaints have no credence because Ms. Rooney rescinded them.  (Doc. 26 at 9).  But Ms. Rooney says that she rescinded her complaints only because she was "so worried" that Plaintiff would harass or fire her in response.  (Doc. 23-38 at 4, ¶ 17 (Rooney affidavit)).  In fact, Ms. Rooney testified that she had "no doubt [Plaintiff] would attempt to get [Ms. Rooney] fired if she found out" that Ms. Rooney had filed a complaint against her.  (*Id.*).  And Ms. Rooney has company.

At least four other employees formally complained about Plaintiff.  (Docs. 23-8, 23-9, 23-10).  One employee said that the "work environment became uncomfortable and transitioned into toxic upon arrival of [Plaintiff]."  (Doc. 23-8 at 1).  A different employee noted a "general unease" with Plaintiff as a reason for her resignation.  (*Id.* at 2).  Another wrote a four-page letter of resignation, including that he could not stay at Pickaway Health because it "would be akin to condoning and encouraging" Plaintiff's "lies" about her qualifications.  (Doc. 23-9 at 3).  And still another employee said that Plaintiff had "no regard for the employees and does not respect their time," and the "hostile work environment" was a "major factor[]" in his decision to resign.  (Doc. 23-10 at 1, 4).

Beyond the formal complaints against Plaintiff, the record shows a volatile relationship between Plaintiff and Director of Nursing Susan Foster, which was concerning for Pickaway County because "it is critically important that the Director of Nursing and Health Commissioner can work together [since] they play such influential roles in [the] agency and community as a whole."  (Doc. 23-1 at ¶ 5 (Wolford affidavit)).  But, immediately, Ms. Foster felt Plaintiff did not support her.  (Doc. 23-15 at 1:5 (Foster affidavit)).  Then, after months of relentless disagreement

between Plaintiff and Ms. Foster (*see id.* at 3:13–14), Plaintiff suspended Ms. Foster without pay when she did not attend a training she had already attended twice before. (Doc. 23-15 at 3:14).

Unsurprisingly, the relationship between Plaintiff and Ms. Foster worsened. Plaintiff required Ms. Foster to report to her daily. (*Id.* at 5:29). Plaintiff then escalated the acrimony, calling the Sheriff's Department after Ms. Foster followed her into the parking lot and asked Plaintiff to sign her timesheet. (Doc. 23-36). And, when Ms. Foster did not immediately vacate her office after Plaintiff had suspended her, Plaintiff called the Sheriff's Department to report a "disturbance." (Docs. 23-15 at 5:31; 23-39). So, the record shows that Plaintiff had issues with at least six employees during her one-year tenure.

On the other side of the equation, Plaintiff has not identified any of her fellow employees willing to testify inapposite of Defendant's evidence. (Doc. 23-3 at 7). So the Court finds that Defendant has satisfied its burden of production in showing it had a legitimate nondiscriminatory reason for terminating Plaintiff due to her persistent conflicts with coworkers.

b.    Policy Violations

And Defendant provides another reason for termination. Defendant says that Plaintiff violated Department policies, including "providing false information, making a false statement committing a fraudulent act, or withholding pertinent information in the employment application process" and "dishonesty or dishonest action . . . ." (Doc. 23-14 at 9, 10). An employer's belief that an employee misrepresented her qualifications is a legitimate, nondiscriminatory reason for terminating her. Notably, a defendant need not prove that plaintiff intentionally lied or misrepresented her qualifications. Defendant needs only to "produce evidence 'sufficient for the trier of fact to conclude' [Plaintiff] was terminated because of [the Board's] belief that [she] lied[,]" since lying is a dischargeable offense. *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 854

13

(D.C. Cir. 2006) (citing *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000)); *see also Shazor v. Pro. Transit Mgmt., Ltd.*, 744 F.3d 948, 959 (6th Cir. 2014) (finding that the defendant's burden of showing it had a legitimate, nondiscriminatory reason for terminating the plaintiff was satisfied when it offered the explanation that the employer believed the plaintiff had lied to board members).

Here, Plaintiff provided her resumé in her application for the position, which indicated, in relevant part:

**EDUCATION**

**MBA**                                                                                *10/2015*
Wright State University, Dayton OH, *Concentration in Strategic Management Research*
. . .

**LICENSURES AND AWARDS**

. . .

**Registered Sanitarian License, Ohio**                                    *2010*

(Doc. 23-2 at 3). These details on her resumé were important. The Board's president, Michael Wolford, recommended that the Board hire Plaintiff because Plaintiff's resumé and interview "were excellent . . . ." (Doc. 23-1 at 1, ¶ 3). He "was impressed [that] she had two Masters' degrees[,] and that was a compelling reason to hire her." (*Id.*). But Plaintiff did not have two Masters' degrees. She never obtained an MBA, despite the insinuation on her resumé. Plaintiff now acknowledges mistakes as to her education in her resumé and LinkedIn page, blaming "a typo on [her] resume and [her] LinkedIn profile which say the start date for the MBA program but not an end date." (Doc. 27-2 at 6, ¶ 28).

Typographical error or not, the "Board was alarmed about what appeared to be blatant dishonesty designed to make [Plaintiff] seem like a more qualified candidate than she actually was." (Doc. 23-1 at 2, ¶ 9 (Wolford affidavit)). "This was a very significant issue[,]" because, "if

14

[Plaintiff] had intentionally misrepresented her qualifications, [the Board] could not trust her to lead [the] organization." (*Id.*).

More still, Plaintiff's sanitarian license had expired. (Doc. 27-2 at 6, ¶ 29). In explanation, Plaintiff says that her resumé "only states that [she] had a registered sanitarian license, not the status." (*Id.*). Under Ohio administrative law, registered sanitarians must abide by a code of conduct, including but not limited to not "[m]aking a material misrepresentation" or "[a]llowing an unregistered person to use a registrant's certificate of registration[.]" Ohio Admin. Code 4736-13-01(B)(2),(3). And, again, the implication of Plaintiff's resumé is that she has been a registered sanitarian since 2010, meaning she holds a valid sanitarian license. Michael Wolford confirmed in a performance evaluation from December 2019 that these discrepancies informed the Board's opinion of Plaintiff. (Doc. 23-43). He wrote:

> [S]taff members also raised the issue that [Plaintiff] does not have an MBA nor was she currently a registered sanitarian (RS) as were written on her resume at the time of her hiring interview and employment process. Both were also listed on her LinkedIn internet page well after her employment at [Defendant]. When asked about these credentials by the [Board], [Plaintiff] deleted the MBA from her LinkedIn page and renewed her Ohio RS certification the next day. She did not verbally take responsibility for these falsifications of her qualifications to the [Board] when questioned.

(*Id.* at 5). At bottom, Plaintiff's misrepresentations about her education and credentials had a long-term effect on her trustworthiness. Her actions led the Board to believe she had lied intentionally about her qualifications in order to secure the position.

And Plaintiff violated more policies when she suspended Ms. Foster without pay and demoted Ms. Foster without Board approval. (Docs. 23 at 11 (citing 23-15, 23-37, 23-32); 23-18 (written reprimand); 23-14 (discipline policy)). As such, Defendant has set forth sufficient evidence showing that Plaintiff violated policies. *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1061 (S.D. Ohio 2020) ("Violations of express company polices are legitimate,

nondiscriminatory reasons to take adverse employment action.") (citing *Holmes v. J.P. Morgan Chase Nat'l Corp. Servs., Inc.*, No. 09-10642, 2010 WL 259051, at \*6, 2010 U.S. Dist. LEXIS 4124, at \*8 (E.D. Mich. Jan. 20, 2010); *Blackshear v. Interstate Brands Corp.*, 495 Fed. App'x 613, 618 (6th Cir. 2012)); *Worsham v. Anthem Ins. Cos., Inc.*, No. 1:21-CV-331, 2023 WL 2716596, at \*6 (S.D. Ohio Mar. 30, 2023) ("Dishonesty also constitutes a legitimate, non-discriminatory reason for adverse employment action.") (citing *Schwendeman*, 436 F. Supp. 3d at 1061).

*****

All told, Defendant has satisfied its burden. Plaintiff's conflicts with personnel are enough. Defendant believing Plaintiff lied about her qualifications is enough. And Plaintiff not abiding by Pickaway County policies in suspending and demoting Ms. Foster further bolsters Defendant's position.

### iii. <u>Pretext</u>

Defendant has shown legitimate, nondiscriminatory reasons for terminating Plaintiff. To survive summary judgment, Plaintiff must therefore adduce enough evidence for a reasonable jury to conclude that Defendant's asserted reason was just pretext for illegal discrimination. *McDonnell Douglas*, 411 U.S. at 803–07. A plaintiff can establish pretext by showing that: (1) the employer's reason has no basis in fact; (2) the reason did not actually motivate the employer's adverse employment action; or (3) the reason was insufficient to motivate the adverse employment action. *Adebisi v. Univ. of Tenn.*, 341 F. App'x 111, 113 (6th Cir. 2009) (citing *Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 (6th Cir. 2000). But, in evaluating the three-part test for a particular case, a "court must bear in mind that '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason

16

or not?'" *Baggett v. City of Cincinnati*, No. 1:19-CV-1061, 2022 WL 899675, at *5 (S.D. Ohio Mar. 28, 2022), aff'd sub nom. *Baggett v. City of Cincinnati, Ohio*, No. 22-3338, 2022 WL 17337851 (6th Cir. Nov. 30, 2022) (citing *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). The Court must ask "whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong the evidence is." *Id.* Plaintiff has set forth no such evidence.

And, as explained above, the other side of the ledger is long. The Board, comprised of seven members (Doc. 13 at ¶ 17), ultimately made the decision to terminate Plaintiff. (Doc. 23-48). It came to this decision after its members were made aware of the following:

- Plaintiff misrepresented her qualifications on her resumé and LinkedIn page. (Doc. 27-2 at 6, ¶ 28–29).

- Two employees resigned, citing Plaintiff as a reason for the resignation. (Docs. 23-9, 23-10).

- Plaintiff called the police twice after verbal altercations with then-Director of Nursing Susan Foster. (Docs. 23-36; 23-39; 23-3 at 4).

- Plaintiff suspended Foster without pay, violating guidelines set forth in the Pickaway Health Policy. (Docs. 23-18 (written reprimand); 23-14 (discipline policy)).

- Plaintiff demoted Foster without Board approval, in violation of the guidelines set forth in the Pickaway Health Policy. (Docs. 23-37 (demotion letter); 23-14 (discipline policy)).

- Plaintiff's own administrative assistant, Jessica Rooney, filed a formal complaint about her (Doc. 23-40); rescinded that complaint, saying that nothing in it was inaccurate but instead that she felt differently now (Doc. 27-12); then filed another complaint about Plaintiff, saying Plaintiff made her feel "intimidated[,]" "scared[,]" and "incompetent." (Doc. 23-

41). Rooney later says she rescinded the first complaint, because she "feared [Plaintiff] would harass [her] or fire [her] if [she] complained. [Plaintiff] had also just threatened [her] job over something and [she] had no doubt [Plaintiff] would attempt to get [her] fired if [Plaintiff] found out [about Rooney's complaint]. In fact, [she] was so worried that [she] originally rescinded [her] first complaint out of fear of retaliation from [Plaintiff]." (Doc. 23-38 at 4 (Rooney affidavit)).

Because of the tumult, the Board hired an independent investigator. Ultimately, the investigation concluded that complaint procedures were informal, often involving discussing the matters with Plaintiff. (Doc. 27-15 at 13). But the investigation found that employees were "less confident" in how personnel issues would be handled due to interdepartmental tension. (*Id.*) It found that "multiple employees stated that co-worker or departmental conflict is the most serious problem" and that "most employees expressed a bit of frustration or concern at the personality issues . . . ." (*Id.* at 19). And the investigation identified some of the top priorities to be: "[a]ddress[ing] personality and personnel conflicts head-on[,]" "[t]ry[ing] to solve the 'drama' and conflicts[,]" "[c]ut[ting] back on micromanaging[,]" and "[d]eal[ing] with the tension with employees and departments[.]" (*Id.* at 20). At the end of the investigation, the independent consultant suggested that the Board "implement[] concepts and ideas regarding the communication between departments and addressing the personality conflicts within the agency" so as to "solve what appears to be the most common employee concern that can be addressed with the least significant financial or budgetary impact." (*Id.* at 21).

So, after all of the events that transpired during Plaintiff's tenure as Health Commissioner, the Board took the independent consultant's suggestion and addressed personality conflicts by terminating Plaintiff, who seemed to be the conflicts' common denominator. Ultimately, the

Court's "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Baggett*, No. 1:19-CV-1061, 2022 WL 899675, at *5 (citations omitted). Here, Defendant did so.

And Plaintiff, despite her burden of production, mostly suggests that summary judgment is inappropriate because determining whether Defendant's reasons for terminating her were pretextual would require the fact-finder to assess the credibility of witnesses. (Doc. 27 at 10). It is true that "[i]f the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. . . . Rather, credibility determinations must be left to the fact-finder." *Barrow v. Terminix Int'l Co., L.P.*, No. 3:07-CV-324, 2009 WL 243093, at *6 (S.D. Ohio Jan. 29, 2009) (citations omitted). But that is not the case here.

A plaintiff's "conclusory allegations and subjective beliefs . . . are wholly insufficient evidence to establish a claim of discrimination as a matter of law." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 585 (6th Cir. 1992) (citations omitted); *see also Hartsel v. Keys*, 87 F.3d 795, 801–02 (6th Cir. 1996) (holding that the employee's subjective belief as to why she was terminated fails to satisfy the summary judgment standard). In fact, in order to "cast[] doubt" on the employer's explanation for termination, *Baggett*, No. 22-3338, 2022 WL 17337851, at *5 (citations omitted), a plaintiff must put forth evidence that "demonstrates the employer did not 'honestly believe' in the proffered nondiscriminatory reason for its adverse employment action." *Nolan v. Ohio Dep't of Rehab. & Corr.*, No. 21-4213, 2022 WL 17759905, at *7 (6th Cir. Dec. 19, 2022) (citations omitted).

Plaintiff relies on one piece of evidence to argue pretext. She says that she overheard someone say, "they wouldn't hire a Black woman" (Docs. 27 at 3; 13 at ¶ 26), after she interviewed

19

for the position. But the Board did hire Plaintiff. So, the extent of animus she alleges does not appear to have influenced the hiring process, as the comment claims.

Still more, "[w]hen considering pretext, statements by non decisionmakers or statements by decisionmakers unrelated to the decisional process at issue cannot suffice to satisfy plaintiff's burden of demonstrating animus." *Barrow*, No. 3:07-CV-324, 2009 WL 243093, at *9 (citations omitted). Here, the decisionmakers in Plaintiff's termination were the Board members. Plaintiff does not attribute the comment to any individual but says that the Director of Environmental Health (Jere Marks), the Deputy Health Commissioner (Jimmie Davis), and then-Director of Nursing (Elaine Miller) were part of the conversation. (Doc. 27 at 3). Jere Marks and Jimmie Davis were never members of the Board. Elaine Miller was a member of the Board when it decided to terminate Plaintiff. (Doc. 23-48 at 1). But she did not unilaterally terminate Plaintiff. In fact, she did not even move to terminate Plaintiff; instead, Board Member Spencer Cheek did. (*Id.* at 2). And then, the Board unanimously voted to terminate Plaintiff.

The Court cannot find that Plaintiff met her burden of showing pretext when her only supporting evidence are her perceptions of what happened and a single remark made by an unknown speaker in a conversation between two non-decisionmakers and one Board member one year before Plaintiff's termination. *Worthy v. Mich. Bell Tel. Co.*, 472 Fed. App'x 342, 348 (6th Cir. 2012) ("To determine if statements are 'relevant' as direct evidence of discrimination or are merely 'stray remarks,' courts generally consider: (1) whether the remarks were made by the decisionmaker or by an agent uninvolved in the challenged decision; (2) whether the remarks were isolated or part of a pattern of biased comments; (3) whether the remarks were made close in time to the challenged decision; and (4) whether the remarks were ambiguous or clearly reflective of discriminatory bias.").

20

Ultimately, Plaintiff has not shown that Defendant's proffered explanation for her termination is pretextual. *See Myers v. Cuyahoga Cnty., Ohio*, 182 F. App'x 510, 518 (6th Cir. 2006) ("In the one page of her . . . brief devoted to [pretext], [Plaintiff] does not refute [Defendant's] stated reason for her termination . . . ."). Summary judgment for Defendant is appropriate for Plaintiff's race discrimination claims.

### B. Retaliation Claim

Next in her Complaint, Plaintiff alleges that Defendant retaliated against her after she "complained about the racial harassment she was experiencing" (Doc. 13 at 19), in violation of Title VII of the Civil Rights Act of 1964 and Ohio Revised Code (O.R.C.) § 4112.01(I). (Doc. 13 at 1, 19–21). Defendant counters there is no causal connection between the protected activity and Plaintiff's termination. (Doc. 23 at 27–31).

Initially, the Court notes that Plaintiff abandoned her claims of retaliation because she did not address the claims in her Response in Opposition of Defendant's Motion for Summary Judgment (Doc. 27). *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011) (holding that a district court properly declines to consider the merits of a claim when a plaintiff fails to address it in a response to a motion for summary judgment); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006) (recognizing that the failure to respond properly to motion for summary judgment arguments constitutes abandonment of a claim). The Court may grant summary judgment in Defendant's favor on this basis alone.

Briefly, however, the Court notes that summary judgment is warranted on the record, too. Like Plaintiff's other claims, her retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework because she has offered no direct evidence of retaliation. *See Gipson v. Dep't of Rehab. & Corr.*, No. 2:18-CV-315, 2020 WL 1233638, at *7–8 (S.D. Ohio Mar. 13,

2020); *Dijon v. Cent. Ohio Transit Auth.*, No. 2:20-CV-05873, 2022 WL 4468587, at *6–7 (S.D. Ohio Sept. 26, 2022); *Boutros*, 997 F.2d at 202–03 (applying the *McDonnell Douglas* framework to a claim under Title VII); *Plumbers & Steamfitters Joint Apprenticeship Comm.*, 66 Ohio St. 2d at 197 (applying the *McDonnell Douglas* framework to a claim under O.R.C. Chapter 4112).

          i.   <u>Prima Facie Case</u>

For her retaliation claim, Plaintiff must show: "(1) [s]he engaged in activity protected by Title VII; (2) [her] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was 'materially adverse' to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Jones v. Johanns*, 264 F. App'x 463, 466 (6th Cir. 2007) (citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 68 (2006); *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003)).  Defendant challenges only the fourth prong of the prima facie case.  (Doc. 23 at 27–31).

Establishing causation "requires proof, even at the prima facie stage, that the unlawful retaliation would not have occurred but for [Plaintiff's] protected activity."  *Wingo v. Mich. Bell Tel. Co.*, 815 F. App'x 43, 46 (6th Cir. 2020) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013); *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 770 (6th Cir. 2015) (en banc)).  While Plaintiff does not argue how complaining to Mayor McIlroy was the but-for causation for her termination in part due to her not addressing these claims in her response brief, the Court will endeavor to formulate an argument on her behalf.

Plaintiff complained to Mayor McIlroy on December 6, 2019 (Doc. 27-2 at 4, ¶ 19), and Plaintiff was placed on paid administrative leave on February 4, 2020 (Docs. 23-44; 23-45) and ultimately terminated on March 4, 2020 (Doc. 23-48).  Generally speaking, temporal proximity is

generally not enough to establish the prima facie element of causation. *Wingo*, 815 F. App'x at 46–47 (citing *Kuhn v. Washtenaw Cty.*, 709 F.3d 612, 629 (6th Cir. 2013); *Newton v. Ohio Dep't of Rehab. & Corr.-Toledo Corr. Inst.*, 496 F. App'x 558, 567 (6th Cir. 2012) (noting that "causation, not temporal proximity itself ... is an element of plaintiff's prima facie [Title VII retaliation] case")); *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999) (observing that temporal proximity, by itself, "will not support an inference [of retaliation] in the face of compelling evidence")). This is especially so when an intervening act interrupts the alleged causal chain between a protected act and an adverse employment action. *Id.*

Here, the intervening act is the launch of an independent investigation. The investigation identified several interpersonal and departmental conflicts, recommending that the Board address these issues to improve employee satisfaction. (Doc. 27-15 at 13, 19–21). More still, Plaintiff purportedly complained to Mayor McIlroy only after the Board shared their dissatisfaction with her performance. (Doc. 13 at ¶¶ 54–55). Then, despite holding a board meeting on December 17, 2019 (*id.* at ¶ 58), the Board did not place Plaintiff on administrative leave until nearly two months after Plaintiff complained to Mayor McIlroy. (Docs. 23-44; 23-45).

As such, the Court finds that Plaintiff has not established a temporal proximity between her complaint to Mayor McIlroy and her termination. Nor has Plaintiff set forth any additional "evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (citations omitted). Plaintiff has not satisfied the fourth prong of the prima facie case for retaliation, and summary judgment in favor of Defendant is appropriate.

### C. Remaining Claims

Also, in her Complaint, Plaintiff alleges that Defendant wrongfully terminated her in violation of public policy, retaliated against her by terminating her employment based on her

complaints of racial harassment in violation of 5 U.S.C. § 2302, and breached her five-year employment contract by terminating her without a hearing in front of the Board, in violation of Ohio Revised Code § 2305.06. (Doc. 13 at 21, 23–24). These claims have been abandoned and are otherwise without merit.

As with the retaliation claim, Plaintiff did not address these claims in her Response in Opposition of Defendant's Motion for Summary Judgment (Doc. 27). *Hicks*, 449 F. App'x at 487; *Clark*, 178 F. App'x at 524–25 (6th Cir. 2006). The Court may grant summary judgment in favor of Defendant for these claims on this fact alone. But, again, the Court briefly discusses the claims' merits.

Plaintiff's wrongful termination claim fails because Ohio Revised Code Chapter 4112 includes various remedies for discriminatory practices. In such a case, "there is no need to recognize a common-law action for wrongful discharge if there already exists a statutory remedy that adequately protects society's interests.'" *Kunkle v. Q-Mark, Inc.*, 2013 U.S. Dist. LEXIS 91235, at \*11 (S.D. Ohio June 28, 2013) (citing *Wiles v. Medina Auto Parts*, 96 Ohio St.3d 240, 244, 2002 Ohio 3994, 773 N.E.2d 526 (Ohio 2002)). This Court has held that Chapter 4112 provides an adequate remedy for race discrimination, so a common law claim of wrongful termination for violating public policy set forth in Chapter 4112 does not exist. *Shields v. Sinclair Media III Inc.*, No. 1:18-cv-593, 2020 U.S. Dist. LEXIS 110099, at \*43 (June 22, 2020); *Waldron v. Wal-Mart, Inc.*, 2021 U.S. Dist. LEXIS 144602, at \*12 (S.D. Ohio Aug. 3, 2021). As such, Plaintiff's wrongful termination claims in violation of public policy fail as a matter of law.

Plaintiff's claim under 5 U.S.C. § 2302 (Doc. 13 at 23) also fails. This statute provides a remedy to federal employees for whistleblowing and other protected activities. *Atkins v. Stivers*, No. 21-5798, 2021 WL 7084872, at \*2 (6th Cir. Dec. 16, 2021); *Downs v. McDonough*, No. 3:20-

1090, 2021 WL 6011136, at *6 (M.D. Tenn. Dec. 20, 2021), *report and recommendation adopted*, No. 3:20-CV-01090, 2022 WL 411845 (M.D. Tenn. Feb. 9, 2022); *Butrum v. Louisville Metro. Gov't*, No. 3:17-CV-330-RGJ-CHL, 2020 WL 1238268, at *4 (W.D. Ky. Mar. 13, 2020); *Buckner v. Cmty. Mental Health Auth. of Clinton, Eaton, & Ingham Cnty.*, No. 1:18-CV-1408, 2020 WL 1005168, at *4 (W.D. Mich. Feb. 10, 2020); *Siegler v. The Ohio State Univ.*, No. 2:10-CV-172, 2011 WL 1990548, at *3, n. 2 (S.D. Ohio May 23, 2011); *Langdon v. Med. Coll. of Ohio*, No. 3:00CV7442, 2001 WL 238312, at *4 (N.D. Ohio Mar. 5, 2001).  But Plaintiff was a state employee, never a federal one.

Lastly, Plaintiff's breach of contract claim (Doc. 13 at 23–24) fails.  Plaintiff was a public employee because she worked for a county health department.  And "as a public employee, [she] held [her] position as a matter of law, rather than as a matter of contract." *Arnold v. Spencer Twp. Bd. of Trustees*, 2020-Ohio-4706, ¶ 18, 2020 WL 5834504 at *3 (Ohio Ct. App. Sep. 30, 2020). *See also Fuldauer v. City of Cleveland*, 32 Ohio St.2d 114, 290 N.E.2d 546, 551 (Ohio 1972) (citing *State ex rel. Gordon v. Barthalow*, 150 Ohio St. 499, 83 N.E.2d 393 (Ohio 1948)).

## IV.    CONCLUSION

For the reasons stated, Defendant's Motion for Summary Judgment (Doc. 23) is **GRANTED**. This action is **DISMISSED**, and the Clerk is **DIRECTED** to enter final judgment.

IT IS SO ORDERED.


Date:   June 13, 2023                          /s/ Kimberly A. Jolson
                                               KIMBERLY A. JOLSON
                                               UNITED STATES MAGISTRATE JUDGE